[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10487
_____

D.C. Docket No. 2:16-cv-01521-MHH

ANTHONY PIAZZA,
as personal representative of the Estate of
Ricky DeAngelo Hinkle, deceased,

Plaintiff,

NYREEKIS JARNELL HUNTER,
as personal representative of the Estate of
Ricky DeAngelo Hinkle, deceased,

Plaintiff - Appellee,

versus

JEFFERSON COUNTY, ALABAMA,
an Alabama county, individually, et al,

Defendants,

MIKE HALE,
RON EDDINGS,
HABIMANA DUKUZUMUREMYI,
each individually,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 9, 2019)

Before TJOFLAT, NEWSOM, and GILMAN,[*] Circuit Judges.

NEWSOM, Circuit Judge:

Ricky Hinkle died in the Birmingham City Jail after being shocked with a taser, twice.  Hinkle's son, Nyreekis Hunter, brought suit under 42 U.S.C. § 1983 alleging several claims on his behalf, including, as relevant here, (1) an excessive-force claim against Deputy Habimana Dukuzumuremyi and (2) supervisory-liability claims for excessive force and deliberate indifference to Hinkle's serious medical needs against Sheriff Mike Hale and Captain Ron Eddings.  The officers moved to dismiss Hunter's suit based on qualified immunity, the district court denied their motion, and the officers now appeal.

After careful review, we agree in part and disagree in part with the district court's decision.  We agree that the facts as Hunter has pleaded them show that Deputy Dukuzumuremyi violated Hinkle's clearly established constitutional right to be free from excessive force.  In particular, we hold that Dukuzumuremyi crossed the constitutional line, and clearly so, when, having already tased Hinkle

_____

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

once—dropping him to the floor, rendering him motionless, and causing him to urinate on himself—Dukuzumuremyi shocked him again a full eight seconds later. We disagree, however, that Hunter's allegations show—as they must to support a supervisory-liability claim—a causal connection between either the use of force against Hinkle or any deliberate indifference to Hinkle's serious medical needs, on the one hand, and any policy or custom implemented by Sheriff Hale or Captain Eddings, on the other. Accordingly, we affirm the district court's decision to deny qualified immunity to Deputy Dukuzumuremyi but reverse its decision to deny qualified immunity to Sheriff Hale and Captain Eddings.

# I

Ricky Hinkle, who suffered from alcoholism, heart disease, and depression, was arrested while "visibly intoxicated" and was taken to the Jefferson County Jail in Bessemer, Alabama.[1] The next day, he was transferred to the Birmingham City Jail. Soon thereafter, he began suffering from alcohol-withdrawal symptoms and exhibiting delusional behavior. Jail officers moved Hinkle three different times before eventually (and presumably due to his deteriorating condition) placing him in a cell on Level 3, where Deputies Habimana Dukuzumuremyi and Christopher Cotten were working.

---

[1] The factual allegations in this case are largely undisputed, but because this appeal arises in a motion-to-dismiss posture, where the parties' memories diverge we adopt Hunter's re-telling. *See Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).

Shortly after Hinkle arrived on Level 3, Dukuzumuremyi realized that he couldn't see him on the video monitor, so he called to him over the loudspeaker. When Hinkle didn't respond, Cotten went to investigate and found Hinkle in the corner of his cell, wearing only underpants and shoes. When Cotten asked Hinkle why he was in the corner, Hinkle responded that he "wanted to die." At this, Cotten decided to move Hinkle to a padded cell. He walked Hinkle toward the cell and asked him to remove his shoes. Hinkle initially obeyed but then ran down the hallway to the bathroom and grabbed a shower curtain. Cotten took the shower curtain away from Hinkle shortly before Dukuzumuremyi arrived on the scene.

After the officers attempted three times to pull Hinkle into his new cell, Dukuzumuremyi fired his taser, hitting Hinkle on the left side of his chest just above his heart. As a result of that taser shock—which lasted 5 seconds—Hinkle fell to the floor on his right side and urinated on himself. Dukuzumuremyi then ordered Hinkle to roll over to be handcuffed, but Hinkle remained unresponsive. Eight seconds after the end of the first shock, and while Hinkle still lay motionless (and wet) on the ground, Dukuzumuremyi tased him again, this time on the front left side of his neck. Shortly after the second shock, Hinkle went into cardiac arrest. He was taken to the emergency room, where he was pronounced dead.

4

Hinkle's son Nyreekis Hunter, acting as personal representative of Hinkle's estate, brought suit under 42 U.S.C. § 1983 on Hinkle's behalf.[2]  As relevant here, Hunter sued Deputy Dukuzumuremyi for excessive force and Deputy Cotten for failure to intervene, and both deputies for deliberate indifference to Hinkle's serious medical needs.  He also sued Sheriff Hale and Captain Eddings on a supervisory-liability theory based on the excessive-force and deliberate-indifference claims.  The officers moved to dismiss on qualified-immunity grounds.[3]

The district court granted in part and denied in part the officers' motion to dismiss.  The court dismissed the deliberate-indifference claim against Dukuzumuremyi and Cotten, finding that the complaint "contain[ed] no allegations to indicate that either deputy had subjective knowledge of the decedent's medical condition."  The court also dismissed the failure-to-intervene claim against Cotten.[4]  But the court denied the motion to dismiss as to (1) the excessive-force

---

[2] The initial complaint was filed by Anthony Piazza, who is not related to Hinkle.  After some dispute over whether Piazza could properly represent Hinkle's estate, Hunter replaced Piazza as Hinkle's personal representative.

[3] Hunter also brought state-law claims against each officer for negligence and wrongful death; the district court dismissed each claim on state-law grounds.

[4] Deputy Cotten is not a party to this appeal because the district court dismissed all claims against him.  Two other defendants, Dr. David Hicks and Advanced Correctional Healthcare, were also named in Hunter's complaint—for exhibiting deliberate indifference to Hinkle's serious medical needs—but neither is a party to this appeal.

claim against Dukuzumuremyi and (2) the supervisory-liability claims against Hale and Eddings.  Dukuzumuremyi, Hale, and Eddings timely appealed.[5]

## II

We review *de novo* a district court's denial of qualified immunity.  *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).  Qualified immunity shields a government official from liability unless he violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).  An officer asserting a qualified-immunity defense bears the initial burden of showing that he was "acting within his discretionary authority."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).  After the officer makes this showing—and here, it is undisputed—the burden shifts to the plaintiff to show that (1) the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged violation.  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  We may consider these two prongs in either order; an official is entitled to

---

[5] We have jurisdiction over the officers' interlocutory appeal under 28 U.S.C. § 1291 because the district court denied qualified immunity based on questions of law—namely, whether the officers violated Hinkle's constitutional rights and whether those rights were clearly established.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

qualified immunity if the plaintiff fails to establish either. *Jacoby v. Baldwin County*, 835 F.3d 1338, 1344 (11th Cir. 2016).

We start with the excessive-force claim against Deputy Dukuzumuremyi, and then move to the supervisory-liability claims against Sheriff Hale and Captain Eddings.

## A

### 1

First things first. What constitutional provision governs the use of force in this case, and what doctrinal standard guides our analysis? While the Fourth Amendment prevents the use of excessive force during arrests, *see Graham v. Connor*, 490 U.S. 386, 388 (1989), and the Eighth Amendment serves as the primary source of protection against excessive force after conviction, *see Whitley v. Albers*, 475 U.S. 312, 327 (1986), it is the Fourteenth Amendment that protects those who exist in the in-between—pretrial detainees. *Garrett v. Athens–Clarke County*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004).[6]

That pretrial detainees fall within the Fourteenth Amendment's ambit dates to the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520 (1979). The

---

[6] Although some courts have extended Fourth Amendment protections into the pretrial detention phase, *see, e.g.*, *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010), "[n]either [this Court] nor the Supreme Court has decided whether the Fourth Amendment continues to provide individuals with protection from excessive force beyond the point at which an arrest ends and pretrial detention begins," *J W by & through Tammy Williams v. Birmingham Board of Education*, 904 F.3d 1248, 1259 (11th Cir. 2018).

Court explained there that the "proper inquiry" when "evaluating the constitutionality of conditions or restrictions of pretrial detention" is "whether those conditions amount to punishment of the detainee." *Id*. at 535. "For under the Due Process Clause," the Court continued, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id*.

Although pretrial detainees' excessive-force claims have been analyzed under the Fourteenth Amendment since *Bell*, the constitutional inquiry—at least in this Circuit—has long resembled the one that governs prisoners' excessive-force claims under the Eighth Amendment. Historically, both prisoners and pretrial detainees needed to show not only that a jail official deliberately used excessive force, but also that the official did so "maliciously or sadistically for the very purpose of causing harm." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005), *overruled by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). All that changed a few years back, though, when the Supreme Court clarified that, unlike a prisoner bringing an Eighth Amendment excessive-force claim, a pretrial detainee raising a Fourteenth Amendment claim needn't prove an officer's subjective intent to harm but instead need show only that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473.

8

Harking back to *Bell*, the *Kingsley* Court explained that, unlike in Eighth Amendment cases, there is no need in the pretrial-detainee context to determine "*when* punishment is unconstitutional" because a pretrial detainee has not yet been adjudicated guilty and thus may not be punished at all. *Id*. at 2475 (emphasis added). Although, under *Bell*, impermissible "punishment" could mean force deployed with a subjective, "expressed intent to punish," it also could mean force that, as an *objective* matter, is "not rationally related to a legitimate governmental" purpose or is "excessive in relation to that purpose." *Id*. at 2473–74. After *Kingsley*, then, if force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, it constitutes "punishment" and is therefore unconstitutional. Notably, inasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment. *Compare Kingsley*, 135 S. Ct. at 2472–73 (holding that a pretrial detainee in the Fourteenth Amendment context "must show only that the force purposely or knowingly used against him was objectively unreasonable"), *with Graham*, 490 U.S. at 397 (explaining that the Fourth Amendment excessive-force inquiry asks "whether the officers' actions are 'objectively reasonable' in light of the facts and

9

circumstances confronting them, without regard to their underlying intent or motivation").

Obviously, "legitimate interests"—including the need to "preserve internal order and discipline" and "maintain institutional security"—may at times require jail officers to use force. *Kingsley*, 135 S. Ct. at 2473 (citation omitted). And of course, officers facing disturbances are often forced to make "split-second judgments" about the need for such force "in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 2474 (quoting *Graham*, 490 U.S. at 397). Because of this, we can't (and won't) evaluate a pretrial detainee's excessive-force challenge in a glib, post-hoc fashion or "with the 20/20 vision of hindsight." *Id.* at 2473. Instead, we must do our best to consider the situation through the lens of "a reasonable officer on the scene." *Id.*

How do we know, then, when force is reasonable and when it is "excessive in relation to its purpose"? Well, as relevant to this case, our decisions make one thing clear: "Once a prisoner has *stopped resisting* there is no longer a need for force, so the use of force thereafter is disproportionate to the need." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (emphasis added), *abrogated on other grounds by Kingsley*, 135 S. Ct. 2466. Accordingly, "[w]hen jailers continue to use substantial force against a prisoner who has clearly *stopped resisting*—whether because he has decided to become compliant, he has been subdued, or he is

10

otherwise incapacitated—that use of force is excessive." *Id.* (emphasis added); *see also Ort v. White*, 813 F.2d 318, 327 (11th Cir. 1987) ("A [F]ourteenth [A]mendment violation occurs . . . where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased."); *Bozeman*, 422 F.3d at 1271–72 (finding excessive force when officers continued to suffocate a detainee by pushing his face into a mattress after he had stopped struggling and said he'd had enough), *overruled on other grounds by Kingsley*, 135 S. Ct. 2466.[7]  In other words, because force in the pretrial detainee context may be defensive or preventative—but never punitive—the continuing use of force is impermissible when a detainee is complying, has been forced to comply, or is clearly unable to comply.

## 2

In the case before us, then, we must determine whether the force used against Hinkle was objectively unreasonable—*i.e.*, whether it was "excessive in relation to [its] purpose." *Kingsley*, 135 S. Ct. at 2473–74.  To briefly recap, the critical events began when Hinkle broke away from Cotten, ran down the hallway,

---

[7] To be clear, *Bozeman* and *Danley* remain relevant to our inquiry even though both employed the more stringent pre-*Kingsley* standard of proof: whether force was applied "maliciously or sadistically for the very purpose of causing harm." *Bozeman*, 422 F.3d at 1272.  Because proving *both* that the force applied in a given situation was objectively excessive *and* that it was applied "maliciously or sadistically for the very purpose of causing harm" will almost invariably be more difficult than proving only that the force used was objectively excessive, these cases continue to provide pertinent examples of excessive force in the pretrial-detainee context.

11

and grabbed a shower curtain.  (Not the curtain rod, mind you—the *curtain*.)  After three unsuccessful attempts to lead Hinkle into his cell, Dukuzumuremyi fired his taser, hitting Hinkle just above the heart with a five-second shock.  Eight seconds after the first shock ended—and with Hinkle still prostrate on the ground, and having wet himself—Dukuzumuremyi tased Hinkle again.

The parties don't dispute that the first shock was a permissible use of force given Hinkle's resistance and the officers' need to "preserve internal order and discipline" and "maintain institutional security."  *See Kingsley*, 135 S. Ct. at 2473.  The issue is the second shock.  Dukuzumuremyi asserts that the second shock doesn't constitute excessive force in light of (1) Hinkle's failure to roll over to be handcuffed "after being ordered—and being given an opportunity—to do so," and (2) the "split-second decisions" that jail officers must make.  The facts alleged, however, undermine both assertions.

Again, according to Hunter's complaint, following the first taser shock Hinkle fell to the floor, lay motionless, and urinated on himself.  Even so, Dukuzumuremyi contends that because Hinkle failed to obey the subsequent order to roll over and be handcuffed, he was not yet *fully* compliant.  Because Hinkle was not following commands, the argument goes, the second shock couldn't have crossed the constitutional line.  Oral Arg. Tr. 7:07.  Wrong.  It seems to us totally unreasonable to expect that a man who is lying on the floor immobilized—and

12

incontinent—following a taser shock should pep up, roll over, and submit to handcuffing within eight seconds.  But, Dukuzumuremyi counters, Hunter's complaint doesn't specifically allege that Hinkle "could not" roll over, only that he "did not."  Oral Arg. Tr. 7:45.  Come on.  The only reasonable inference is that Hinkle, who was lying motionless on the floor after a five-second taser shock— unable to hold his own urine—"did not" immediately roll over because he "could not."  (Really, is there any surer indication of a grown man's inability to control his bodily functions than his wetting himself?)

The same facts undermine Dukuzumuremyi's contention that the second shock should be swept into the zone of reasonableness by the deference owed an officer's split-second decisions.  Although we don't for a minute discount the difficult decisions that jail officers must make in the heat of a tussle, simply counting to eight aloud reveals the problem with Dukuzumuremyi's argument.  In eight seconds, you can tie a shoe, sing the chorus of "Row, Row, Row Your Boat," or complete a qualified rodeo bull ride.  And in eight seconds, we believe, any reasonable officer would have concluded that a detainee who lay inert on the floor, having soiled himself, was no longer putting up a fight.  *See Kingsley*, 135 S. Ct. at 2473 (listing "whether the plaintiff was actively resisting" and "any effort made by the officer to temper or to limit the amount of force used" as factors potentially relevant to the excessive-force determination).

Our conclusion is fortified by additional considerations that the Supreme Court mentioned in *Kingsley* that "bear on the reasonableness or unreasonableness of the force used," including the severity of the security issue posed by the detainee and the threat reasonably perceived by the officer. *See Kingsley*, 135 S. Ct. at 2473. Although officers may (of course) use force to "preserve internal order and discipline" and "maintain institutional security," the severity of the problem and the corresponding risk to the officers in this case were—from the very outset— exceedingly minimal. *See id.* Instead of facing, say, a man armed with a *knife* running *toward* them, the officers here faced a man armed with a *shower curtain* running *away from* them. *See, e.g.*, *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) (officer entitled to qualified immunity on an excessive-force claim after shooting a mentally-ill man walking toward him with a hatchet); *Smith v. LePage*, 834 F.3d 1285, 1294–95 (11th Cir. 2016) (officer entitled to qualified immunity on an excessive-force claim when a suspect holding a knife refused to comply with orders to disarm himself); *Singletary v. Vargas*, 804 F.3d 1174, 1185 (11th Cir. 2015) (officer entitled to qualified immunity on an excessive-force claim based on his reasonable belief that a car rolling toward him presented a deadly threat). Although non-compliant, Hinkle had neither threatened nor attempted to harm the officers. While we don't question Dukuzumuremyi's split-second decision to deploy his taser once following several unsuccessful attempts to lead

14

Hinkle into his cell, we see no legitimate basis for the second shock, particularly considering (1) that the first shock had immobilized Hinkle and (2) the minimal threat to order, safety, and security that Hinkle posed even from the outset.

At the end of the day the question before us is this: Is it excessive to tase for a second time a man who, as a result of an initial shock, is lying motionless on the floor and has wet himself, and who presented only a minimal threat to begin with? Undoubtedly, yes. We hold that, based on the allegations in Hunter's complaint, the force used against Hinkle was excessive, and thus unconstitutional.

**3**

Of course, to overcome Dukuzumuremyi's qualified-immunity defense, Hunter must further show that the law that governs his case was "clearly established" at the time of the alleged violation. To qualify, a legal principle must be "settled" and "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The critical question is whether the law gave the officer "fair warning" that his conduct was unconstitutional. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217–18 (11th Cir. 2018) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, it certainly did. It was more than ten years ago now that this Court held, in no uncertain terms, that "[w]hen jailers continue to use substantial force

against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Danley*, 540 F.3d at 1309; *see also id.* ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.").[8] And *Danley* was no innovation; for decades our decisions have embraced and reiterated the principle that an officer may not continue to use force after a detainee has clearly stopped resisting. *See Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002) ("[G]overnment officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments."); *Ort*, 813 F.2d at 327 ("A [F]ourteenth [A]mendment violation occurs . . . where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased.").[9]

---

[8] Again, although *Kingsley* changed the *nature* of the inquiry—by dropping the requirement that a plaintiff prove the officers' subjective malicious intent—it did not change the law with respect to the objective reasonableness of using force against unresisting subjects.

[9] The same basic rule guides our Fourth Amendment cases concerning the use of force against unresisting or subdued arrestees. *See, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (punching a suspect in the stomach constituted excessive force when he was already subdued and not struggling); *Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) (slamming a suspect's head onto the hood of her car constituted excessive force when she no longer posed a

To be clear, it is no answer to say that *Danley* involved pepper spray, *Skrtich* kicks and punches, *Williams* four-point restraints, etc.—and that none of those cases concerned the use of a taser specifically. It's true, of course, that to defeat qualified immunity a rule must be specific enough that an act's unlawfulness "follow[s] immediately from the conclusion that the rule was firmly established," *Wesby*, 138 S. Ct. at 590 (citation omitted). But we have never suggested that the longstanding prohibition on a jail officer's use of force on an incapacitated detainee turns on as fine a point as the particular weapon deployed. And indeed, in the analogous Fourth Amendment context, we have flatly rejected that very distinction—in a case involving a taser, no less. In *Fils v. City of Aventura*, we considered allegations that police officers had impermissibly tased a non-violent, unresisting suspect. 647 F.3d 1272, 1288–90 (11th Cir. 2011). In finding the law prohibiting the tasing clearly established, we relied on one case holding that an officer had used excessive force when he pepper-sprayed a secured suspect in the face as she sat shackled in the backseat of his cruiser, *see id.* at 1289 (citing *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)), another holding that an officer had used excessive force when he punched a handcuffed and unresisting plaintiff in the stomach, *see id.* (citing *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir.

---

threat to the officer nor a flight risk); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (kicking a suspect in the ribs constituted excessive force when he was subdued and no longer resisting).

17

2008)), and yet another holding that an officer had used excessive force when he sicced his police dog on a suspect who was lying still on the ground, *see id.* (citing *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000)). We emphasized that "[a]lthough none of these cases involved tasers," there was "no meaningful distinction under these circumstances" between the use of a taser on an unresisting suspect and the use of pepper spray, fists, or police dogs. *Id.*; *see also Wate v. Kubler*, 839 F.3d 1012, 1022 (11th Cir. 2016) (looking not only to a taser-specific case but also to cases involving a gut-punch and a head-slam to determine that the use of force on an unresisting arrestee violated clearly established law).

So too here. There is "no meaningful distinction" between pepper spray to an unresisting detainee's face, a kick to his gut, or a taser to his chest and neck. The crucial question is whether the law gave Dukuzumuremyi "fair warning" that his conduct—tasing an already-tased, incapacitated, incontinent, and unresisting detainee—violated the Fourteenth Amendment. In the light of our use-of-force precedent, we have no trouble concluding that it did.[10]

---

[10] A panel of this Court also found it clearly established that the repeated deployment of a taser on an unresisting arrestee constituted excessive force in violation of the Fourth Amendment. *Glasscox v. City of Argo*, 903 F.3d 1207 (11th Cir. 2018). We don't rely on *Glasscox* because law can be clearly established for overcoming qualified immunity only if it is established prior to the relevant events, and Hinkle's death occurred in 2014, four years before *Glasscox* issued. That being said, the *Glasscox* Court based its decision on two *earlier* cases—*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), and *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)—that together establish that the repeated use of a taser on an unresisting arrestee constitutes excessive force. Given the ample Fourteenth Amendment precedent prohibiting jail officers from using force on an unresisting detainee, we needn't rely on *Oliver* and *Smith*; we simply note that, given

18

* * *

Accordingly, we hold that Deputy Dukuzumuremyi's second taser shock violated Hunter's clearly established Fourteenth Amendment right to be free from excessive force and that the district court therefore correctly rejected Dukuzumuremyi's qualified-immunity defense.

## B

We turn, then, to consider the supervisory-liability claims against Sheriff Hale and Captain Eddings. The standard by which a supervisor can be held liable for the actions of a subordinate is "extremely rigorous." *Cottone*, 326 F.3d at 1360. Supervisory officials cannot be held liable under § 1983 for unconstitutional acts by their subordinates based on respondeat-superior or vicarious-liability principles. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Instead, absent allegations of personal participation—of which there are none here concerning Hale or Eddings—supervisory liability is permissible only if there is a "causal connection" between a supervisor's actions and the alleged constitutional violation. *Cottone*, 326 F.3d at 1360.

One way that a plaintiff can show the requisite causal connection is by demonstrating that a supervisor's policy or custom resulted in "deliberate

---

the similarities between the Fourth and Fourteenth Amendment inquiries, *see supra* at 9, they would likely lead to the same result.

19

indifference to constitutional rights."[11]  *Id.* at 1360–61.  A plaintiff can also show

that the *absence* of a policy led to a violation of constitutional rights.  *Rivas v.*

*Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).  Either way, though, to prove that

a policy or its absence caused a constitutional harm, a plaintiff must point to

multiple incidents, *see Rivas*, 940 F.2d at 1495–96, or multiple reports of prior

misconduct by a particular employee, *see Danley*, 540 F.3d at 1315.  "A single

incident of a constitutional violation is insufficient to prove a policy or custom

even when the incident involves several [subordinates]."  *Craig v. Floyd County*,

643 F.3d 1306, 1312 (11th Cir. 2011); *see also Goebert v. Lee County*, 510 F.3d

1312, 1332 (11th Cir. 2007) (holding that plaintiff failed to meet the rigorous

standard for supervisory liability when she failed to show that any other inmates

had suffered the same alleged violation).  Hunter has not made the requisite

showing with respect to either of the two theories that underlie his supervisory-

liability claims against Hale and Eddings.

**1**

With respect to excessive force, Hunter asserts that Hale and Eddings

"fail[ed] to adopt and implement adequate policies" concerning the appropriate use

of force and that this failure resulted in a violation of Hinkle's constitutional rights.

---

[11] Hale was the Sheriff of Jefferson County at the time of the relevant events, and Eddings was the Commander of the Birmingham City Jail.  The parties do not dispute that both acted as policymakers for the jail.

Hunter does not, however, allege any other incidents or reports of excessive force by jail employees. Because Hunter's excessive-force claim focuses solely on Hinkle's episode—"a single incident of unconstitutional activity"—it does not, as a matter of law, state a claim against Hale and Eddings for supervisory liability. *See Craig*, 643 F.3d at 1312; *see also Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1329 (11th Cir. 2015) (holding that the "conclusory allegation that the Sheriff's Office was 'on notice' of the need to 'promulgate, implement, and/or oversee' policies pertaining to the 'use of force'" was insufficient when the claim arose from a single incident involving two deputies).[12]

## 2

The same goes for the supervisory-liability claims predicated on an alleged deliberate indifference to Hinkle's serious medical needs. Hunter asserts that Hinkle was an alcoholic who was neither treated for his alcoholism nor provided his prescription medication upon admission to the jail. Hunter does not, though, point to other instances of inadequate medical screening or delayed medical care at

---

[12] *Compare Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006) (finding supervisory liability when multiple inmate complaints, warnings from other prison guards, and letters from family members put a prison warden on notice of a history of widespread abuse by certain prison guards and evidenced a causal connection between an inmate's death by beating and the warden's policy or custom), *with Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999) (finding no supervisory liability for a school superintendent based on a teacher's sexual abuse of a student in the absence of any prior acts by a teacher that would have put the superintendent on notice that the teacher might commit abuse or any evidence of a policy that could have led a teacher to believe that his behavior was permissible).

the Birmingham City Jail, nor does he allege any facts indicating that Hale or Eddings were on notice of the officers' alleged deliberate indifference. *Cf. Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (finding supervisory liability for deliberate indifference to a pretrial detainee's serious medical needs when a supervisor failed to act after repeated complaints of inadequate staffing). Because Hunter's complaint contains only conclusory assertions that jail officers were indifferent to Hinkle's needs pursuant to certain policies or customs—without alleging any facts concerning those policies or customs—he has not stated a claim for supervisory liability for deliberate indifference to serious medical needs. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

\* \* \*

Accordingly, we hold that Hunter has failed to plead facts sufficient to sustain supervisory-liability claims against Sheriff Hale or Captain Eddings and that the district court therefore erred in rejecting the officers' qualified-immunity defenses to those claims.

22

## III

For the foregoing reasons, we affirm the district court's denial of qualified immunity to Deputy Dukuzumuremyi and reverse its denial of qualified immunity to Sheriff Hale and Captain Eddings.

**AFFIRMED IN PART AND REVERSED IN PART.**