[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11448

_____

D.C. Docket No. 6:16-cv-00723-PGB-LRH

ALLEN PULLEN,

Plaintiff-Appellee,

versus

OSCEOLA COUNTY, et. al.,

Defendants,

OFFICER SANTIAGO,
OFFICER RAMIEREZ,
OFFICER OLIVER,
OFFICER OTERO,
CORP. GOWAN,
CORP. WARD,
SGT. KELLY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 17, 2021)

Before BRANCH, GRANT, and TJOFLAT, Circuit Judges.

PER CURIAM:

Allen Pullen sued several corrections officers under 42 U.S.C. § 1983 for allegedly using unconstitutionally excessive force on him during a cell extraction. The officers moved for summary judgment on qualified immunity grounds, but the district court denied their motion because it found that genuine disputes of material fact exist as to: (1) whether Pullen resisted the officers' attempts to subdue him, and (2) the amount of force the officers used during the incident. On appeal, the officers argue that Pullen's version of the facts is blatantly contradicted by the record and that he failed to establish a constitutional violation or a violation of clearly established law. Because we agree with the district court that genuine disputes of material fact exist as to whether the officers violated Pullen's clearly established rights, we affirm.

I.      Background

Pullen's excessive force claim is based on an incident that occurred on May 9, 2014. At the time of the incident, Pullen was a prisoner in Florida's Osceola

2

County jail. The parties present conflicting narratives about what happened that day.

### A.    The Officers' Allegations

The officers allege that, shortly before noon the day of the incident, Pullen requested cleaning supplies to clean his cell. An officer provided Pullen a broom, a dust pan, and a spray bottle with cleaning cleanser. Fifteen minutes later, the officer noticed that Pullen had covered the window to his cell and his cell's camera with toilet paper. The officer instructed Pullen to remove the coverings, but Pullen refused to comply.

When the officers requested the return of the cleaning supplies, Pullen broke the wooden broom handle into pieces and stated: "If you want it come and get it. Call whoever [you] want. The first one to come in here I have something for them." An officer opened the food port of the cell door to speak with Pullen, but Pullen sprayed him with an unknown liquid.

The officers then sprayed a chemical agent into Pullen's cell. Pullen then returned the dustpan and several pieces of the broom handle, but after examining the broom, officers believed several pieces were missing and that Pullen might still have them. Concerned that Pullen might harm himself or corrections officers, the officers retrieved a service shield and formed a four-member cell extraction team.

3

After the extraction team opened the door to Pullen's cell, Pullen threw an unknown liquid at the officers, which they deflected.  He then attempted to kick the lead officer, but was knocked to the ground instead.  Although the officers were able to place Pullen in a prone position, he tucked his hands under his body so that they could not restrain him.  He also attempted to bite two of the officers.  As a result, the officers delivered several "close[d] fist strike[s]" to Pullen's face.

Pullen continued to resist and the officers delivered knee strikes to Pullen's right shoulder, right thigh, and left arm.  After these strikes, the officers were able to secure Pullen's arms and apply leg and hand restraints.  The officers then stopped striking Pullen.  After they had secured Pullen, the officers lifted him to his feet and attempted to bring him to the jail's medical unit; however, Pullen pulled up his legs and refused to walk.  The officers brought Pullen to the ground to regain control and then physically carried him to the medical unit.  In the medical unit, Pullen was treated by two nurses.  While he was being treated, Pullen spoke calmly with the nurses and said, "that was fun."  He then stated that he had purposely opened MRSA-infected wounds and spread the discharge on his arms before the incident.

Later, Pullen was transported to the Orlando Regional Medical Center.  While he was waiting to be transported, Pullen joked, laughed, and sang.  At the Orlando Regional Medical Center, a doctor observed that Pullen had suffered blunt

facial trauma on the right side of his face, but that he had suffered no fractures or abnormalities and was alert and oriented.  In the medical records, the doctors noted that Pullen's eyes were swollen and that he had a "subconjunctival hemorrhage" and "periorbital ecchymoses."  The doctors also diagnosed Pullen with a concussion, a subdural hematoma, and a subcutaneous hematoma.  Pullen was discharged from the hospital two days later.

> B.    Pullen's Allegations

Pullen alleges that the officers gave him cleaning supplies and told him that he had to clean his cell or he would "face [a] 'corrective counseling'"—an off-camera beating.  He attempted to clean his cell but was ultimately ordered to "cuff up" for a "corrective counseling."  He did not initially "cuff up" because "of the physical abuse endured in . . . previous . . . uses of force."

After Pullen refused to comply, the officers sprayed a chemical agent into his cell and entered.  The officers placed him on the ground with his hands behind his back and placed a shield on his back.  The officers then struck the back of his head over 200 times, for approximately seven minutes, until he was rendered unconscious.  During the beating, Pullen "laid down o[n] the ground with [his] hands behind [his] back."  The officers repeatedly yelled at him to "stop resisting" even though he was "not resisting in any way" and had his hands behind his back throughout the incident.

Pullen was then carried to the jail's medical unit and was later transferred to a local hospital where he was "declared a Level 2 Trauma."[1]  He received five CT scans of his brain and was kept in a neurological intensive care unit for three days.

## II.    Procedural History

On April 28, 2016, Pullen filed a complaint against the officers under 42 U.S.C. § 1983.  In a subsequent amended complaint, Pullen alleged that the officers "use[d] excessive force by taking turns punching [him] from behind after [he] was subdued and restrained," in violation of the Eighth Amendment. Specifically, he alleged that he "was placed on the ground prone with hands behind back to surrender to being cuffed," but that "[t]he officers placed a shield over [his] back and continued to strike [him] in the back of his head repeatedly with their fist[s] for about seven minutes, until [he] became unconscious."

The officers moved for summary judgment on qualified immunity grounds.[2] They argued they "each of [their] actions was objectively reasonable in light of the circumstances" and that they only used force "to overcome [Pullen's] physical resistance and place him into restraints so he could be removed from the cell." They provided video recordings of the incident, which they claimed showed that

---

[1]  Pullen also alleges that the officers dropped him several times on the way to the medical unit.

[2]  The officers also moved for summary judgment for failure to exhaust administrative remedies.  The district court rejected their arguments and the officers do not challenge that determination in this appeal.

Pullen "vigorously physically resisted corrections officers' efforts to control [him]." Pullen opposed the officers' motion and filed a declaration stating that, after the officers entered the cell, he "laid down o[n] the ground with [his] hands behind [his] back" and "[t]he officers continued to punch [him] repeatedly over 200 times over a period of about 7 minutes, until [he] became unconscious."

The district court denied the officers' motion for summary judgment. Although it agreed that the officers "had a reasonable basis to use some amount of force to quell [Pullen's] initial disruptive behavior," it found that "[a] question of fact remains as to whether [Pullen] was actively resisting [the officers'] commands once they were inside the cell, *i.e.*, kicking his feet, and refusing to place his hands behind his back." It also found that "the amount of force [the officers] used on [Pullen] is also a disputed issue of fact" because Pullen "attests that [the officers] struck him approximately 200 times, contrary to [the officers'] attestations that they only struck [him] one or two times each to gain control."

As to the video evidence, the court noted that "[d]espite [the officers'] contentions, the video evidence is not indisputable." It found that "the angle of the camera is such that the Court is unable to observe whether [Pullen] was kicking, hiding his hands, or otherwise resisting [the officers'] attempts to handcuff him." Consequently, it found that "[b]ased on the sworn pleadings and evidence

presented . . . that there is a disputed issue of fact that warrants submission to a trier of fact."  The officers timely appealed.

### III.    Standard of Review

"We review the district court's denial of qualified immunity *de novo*." *Stanley v. City of Dalton*, 219 F.3d 1280, 1285 n.5 (11th Cir. 2000).  "In conducting our review, we construe the evidence in favor of the plaintiff and decide whether the defendant is entitled to qualified immunity under the plaintiff's version of the facts." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015); *see id*. ("We acknowledge that the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." (quotation omitted)).

### IV.    Analysis

The officers argue that the district court should not have accepted Pullen's version of the facts for purposes of summary judgment because his account is "blatantly contradicted by the record."  They also argue that Pullen failed to demonstrate a constitutional violation or a violation of clearly established law.

A.    Pullen's Version of the Facts Is Not Blatantly Contradicted by the Record

In general, "[w]e are required to view all facts and draw all reasonable inferences in favor of the non-moving party when reviewing a grant of summary judgment." *Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007); *see*

Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018) (noting that where a video "recording . . . depict[s] an event or action," we may "accept facts clearly depicted in [the] . . . recording even if there would otherwise be a genuine issue about the existence of those facts.").

The officers contend that we should not accept Pullen's version of the facts because it is blatantly contradicted by the video recordings.  They maintain "[t]he video of the subject incident reveals that Pullen . . . vigorously resisted correction officers' efforts to gain control of [him]" and that the officers "immediately discontinued using force upon Pullen when he was brought under control."

Upon independent review of the video, we agree with the district court that the video recordings do not foreclose Pullen's version of the facts.  As the district court noted, the video does not depict what happened on the ground after the

officers entered the cell.[3]  Although the video clearly depicts the officers entering the cell, it only captured what was happening in the top half of the cell and does not depict what happened on the ground as the officers were attempting to subdue Pullen.  Thus, there remain genuine disputes of material fact as to whether Pullen resisted the officers' attempts to subdue him and the amount of force the officers used during the incident, and the district court properly denied the officers' motion for summary judgment.[4]

> **B.     Under Pullen's Version of the Facts, the Officers Violated His Clearly Established Rights**

The officers argue that Pullen failed to establish that they violated his clearly established rights under the Eighth Amendment.  To overcome the defense of qualified immunity, Pullen must show that the officers: (1) violated federal law (2) that was clearly established at the relevant time.  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

---

[3]  While the video does not depict what happened on the ground after the officers entered the cell, it does depict the officers subsequently transporting Pullen to the medical unit and him receiving treatment there.

[4]  The officers quibble with several of Pullen's factual claims, which they assert are contradicted by the record.  For example, the officers argue that video of the incident contradicts Pullen's claims that he was dropped several times while being carried to the medical unit, he lost consciousness during the incident, officers placed a shield on his back and then stood on the shield, and the confrontation lasted for about seven minutes.  Even assuming these factual claims are contradicted by the record, Pullen's core factual claims—that he did not resist the officers' attempts to subdue him and that the officers repeatedly struck him for several minutes after he had been subdued—are not contradicted by the record and are dispositive for our qualified immunity analysis.

### 1.    Constitutional Violation

Viewing the facts and evidence in the light most favorable to Pullen, as we must, Pullen has demonstrated, for purposes of summary judgment, that the officers violated his Eighth Amendment rights.[5]  "[O]nce the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth Amendment . . . , and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation." *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991).  In particular, "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been

---

[5]  The parties dispute whether Pullen's claims are governed by the Eighth Amendment, which applies to a convicted prisoner's claims of excessive force, or the Fourteenth Amendment, which applies to a pre-trial detainee's claims of excessive force, because Pullen had been convicted at the time of the incident but had not yet been sentenced.

Under the Fourteenth Amendment, a pretrial detainee "need only show that 'the force purposely or knowingly used against him was objectively unreasonable.'" *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)); *see id.* ("[I]f force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, it . . . is therefore unconstitutional.").  But under the Eighth Amendment, a prisoner must show "not only that a jail official deliberately used excessive force, but also that the official did so maliciously or sadistically for the very purpose of causing harm." *Piazza*, 923 F.3d at 952 (quotation omitted).

Under either standard, Pullen's allegations—that he was beaten for approximately seven minutes and was not resisting—are sufficient to demonstrate, for purposes of summary judgment, that the officers violated his constitutional rights. *Id.*  Thus, we do not need to resolve which standard applies here.  Because the Eighth Amendment imposes a higher burden for excessive force claims than the Fourteenth Amendment, our conclusion that the officers' alleged conduct satisfies the Eighth Amendment standard for excessive force means that it also satisfies the Fourteenth Amendment's standard for excessive force.

subdued, or he is otherwise incapacitated—that use of force is excessive." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

Here, Pullen alleges that the officers continued to strike him for several minutes after he clearly terminated his resistance. In his declaration, he states that, after the extraction team entered his cell, he "laid down o[n] the ground with [his] hands behind [his] back" and then "[t]he officers continued to punch [him] repeatedly over 200 times over a period of about 7 minutes, until [he] became unconscious." These allegations are sufficient to demonstrate, for purposes of summary judgment, that the officers violated his Eighth Amendment rights.

2.    Clearly Established Law

Pullen has also demonstrated, for purposes of summary judgment, that the officers violated clearly established law.[6] We have held that:

> [a] right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

---

[6] "For claims of excessive force in violation of the Eighth or Fourteenth Amendments, . . . a plaintiff can overcome a defense of qualified immunity by showing only the first prong." *Fennell v. Gilstrap*, 559 F.3d 1212, 1216-17 (11th Cir. 2009); *see Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1186 (11th Cir. 2020) (holding that the *Fennel* "exception continues to apply to Eighth Amendment claims," but not to Fourteenth Amendment claims). Nevertheless, we address the second prong here to demonstrate that, even if the Fourteenth Amendment applies, the officers are not entitled to qualified immunity.

*Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (internal

citations omitted).  Pullen identifies *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir.

2002), as clearly establishing that the officers violated his rights.[7]

In *Skrtich*, we held that "the use of force 'maliciously and sadistically to

cause harm' is clearly established to be a violation of the Constitution."  *Id*. at

1301; *see id*. ("There is simply no room for a qualified immunity defense when the

plaintiff alleges such a violation.").  The officers argue that *Skrtich* is

"inapplicable" here because the prisoner in *Skrtich* provided "zero resistance" to

the officers and "suffered several significant injuries," whereas "Pullen physically

resisted corrections officers prior to and throughout the subject incident" and

suffered "less significant" injuries.  But under Pullen's version of the facts—that

he "laid down o[n] the ground with [his] hands behind [his] back . . . [t]he officers

continued to punch [him] repeatedly over 200 times over a period of about 7

minutes, until [he] became unconscious"—which we must rely upon for summary

judgment purposes, *Skrtich* is indistinguishable and Pullen established that the

---

[7] Although *Skrtich* involved a convicted prisoner and the Eighth Amendment standard for excessive force, we have repeatedly held that the use of force "maliciously and sadistically for the very purpose of causing harm" violates clearly established law "[i]n both the Fourteenth and the Eighth Amendment [contexts]."  *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).  We do not believe that the Supreme Court's subsequent decision in *Kingsley*, which lowered the requirements for an excessive force claim under the Fourteenth Amendment, disturbs this precedent. *See* 576 U.S. at 396–97.

officers violated clearly established law.  *Id.*; *see also Danley*, 540 F.3d at 1309; *Williams*, 943 F.2d at 1576.

V.    Conclusion

For these reasons, we affirm the district court's denial of summary judgment.

**AFFIRMED.**