[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11253

_____

D.C. Docket No. 7:17-cv-00085-HL


NILESH S. PATEL,

Plaintiff - Appellant,

versus

LANIER COUNTY GEORGIA, et al.,

Defendants,

JAMES SMITH,
Deputy Sheriff, Lanier County, Georgia, in his official and individual capacities,

Defendant - Appellee.


_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(August 11, 2020)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

This case principally presents two constitutional questions arising out of a deputy sheriff's decision to place a pretrial detainee in an unventilated, un-air-conditioned transport van on a hot autumn day.  First, by placing the detainee in the van—for a total of about two hours, half of that time alone and unsupervised—did the officer use unconstitutionally excessive force?  And second, by ignoring the detainee's resulting distress—which included unconsciousness, shaking, profuse sweating, and labored breathing—did the officer exhibit deliberate indifference to a serious medical need?  The district court answered both questions in the negative and granted summary judgment for the officer.  We will affirm the district court's decision in part—albeit on different grounds—and reverse in part.

We begin from the premises that exposure to uncomfortable heat is part and parcel of life in the South and, accordingly, that not every "hot car" case will give rise to a cognizable constitutional claim.  Even so, viewing the facts of this particular case in the light most favorable to our detainee—as we must, given the procedural posture—we hold that the officer violated the Constitution in both respects.  And while we conclude that the law underlying the detainee's excessive-force claim was insufficiently "clearly established" to defeat the officer's entitlement to qualified immunity, we hold that the detainee's deliberate-indifference claim should have been allowed to proceed.  We also hold that the

2

district court erred in rejecting the detainee's adjunct state-law claims on official-immunity grounds.

## I

## A

Plaintiff Nilesh Patel and defendant Deputy James Smith present dramatically different versions of the events underlying this appeal. Of course, when "reviewing a district court's grant of summary judgment, we view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party," *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014), and affirm only if the evidence "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quoting *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013)). Accordingly, because the district court granted summary judgment for Deputy Smith over Patel's opposition, we take the facts here in the light most favorable to Patel, and we draw all reasonable inferences in his favor.[1]

---

[1] Despite this elementary principle of summary-judgment practice, Deputy Smith's brief to us largely forges its own narrative, retelling events from his perspective. *See, e.g.*, Br. of Appellee at 4–12. Let us reiterate at the outset that we expect the lawyers and litigants who appear before us to account for procedural posture and settled standards of appellate review. A party who prevails on a motion to dismiss or a summary-judgment motion is certainly free to alert us to his disagreement with his opponent's factual recitation. But when it comes to arguing the merits, he should not—may not—rely on his own factual story. Rather, he should—must—accept his opponent's story and convince us that he is nonetheless entitled to prevail as a matter of law.

In 2014, Patel pleaded guilty in Georgia state court to gambling- and tax-related offenses and, as a result, was sentenced to five years' probation and required to forfeit a store that he had owned—Live Oak Liquors.  A couple of years later, Patel was arrested on charges that he had stolen or damaged previously forfeited property from Live Oak Liquors.  Although the warrant for Patel's arrest was issued in Lanier County, Georgia, he was held in a jail in the adjacent Cook County because Lanier County's facilities were too small to house all of its detainees.

On October 4, 2016, Deputy Smith was tasked with transporting Patel from Cook County to Lanier County for a bond hearing in connection with his arrest. Deputy Smith initially placed Patel in a transport van and drove him from the Cook County jail to the Lanier County courthouse, without incident.  Patel was granted bond at the hearing, but he couldn't post it immediately, so Deputy Smith loaded him back into the van and returned him to the Cook County jail—again, without incident.  A friend posted Patel's bond shortly after he arrived back at the Cook County jail, so Deputy Smith put Patel *back* into the van to return him to Lanier County—this time to the Lanier County Sheriff's Office—to complete some release-related paperwork.

Along the way, Deputy Smith had to make a stop in Lowndes County to pick up Brittney Grant, another pretrial detainee who was being taken to Lanier

4

County to be released on bond.  When Deputy Smith reached the Lowndes County jail, he parked in a sally port—described here as "a metal garage attached to the jail with large steel doors on both ends."  The outside temperature that day was at least 85 degrees Fahrenheit, and although the port provided some shade to the van, the port's doors were closed, resulting in "very hot" conditions within the port generally and, more to the point, inside the van.  Deputy Smith left Patel in the van for almost an hour—without any fan or air conditioning running—while he went inside to retrieve Grant.

When Deputy Smith returned to the van escorting Grant, he "banged on the window" several times, asking if Patel was "okay in there."  Having received no response, Deputy Smith opened the rear doors of the van to find Patel lying unconscious on the floor, sweating and hyperventilating.  By performing a "sternum rub," Deputy Smith was able to rouse Patel, who then told Smith that he had passed out from heat and asked for some water.  Deputy Smith told Patel that he would get him "some water on the way back to Lanier County," assisted Patel back onto the bench in the back of the van, got into the driver's seat, and headed for Lanier County.  It is undisputed that once Deputy Smith cranked the van, a ventilation fan circulated some air in the middle section, where Grant was seated.  But Grant testified that the fan didn't "move very much air at all" and, further, that because of a metal screen separating the middle section of the van from the rear

5

section—where Patel was detained—she didn't "believe any air could circulate into the back area." Grant also explained that although she "could hear the air conditioner running in the front section of the van," because of "a solid plexiglass screen between the driver and the back of the van . . . no cool air made it into the prisoner area of the van."

During the drive to Lanier County, Patel again fell from the bench to the floor of the van, where he remained—unconscious, hyperventilating, and with mucus and saliva running from his nose and mouth—until Deputy Smith again roused him upon their arrival. Deputy Smith never stopped for water, as he had promised.[2] By the time they arrived in Lanier County, Patel had been in the back of the van for more than two hours.

At the Lanier County Sheriff's Office, Deputy Smith again roused Patel and helped him to his feet, and Patel immediately got a drink from a water fountain. Patel then waited in a holding room where he continued to show signs of distress— he was shaking and sweating profusely, he had mucus running from his nose, he

---

[2] Deputy Smith admits that Patel asked for water but asserts that he later declined when Smith offered to get some. That assertion, though, is hard to reconcile with Grant's and Patel's accounts. Grant testified that Deputy Smith said he would get water along the way but never did and that Smith never brought any water in response to Patel's request, and she never mentioned anything about Patel declining water. For his part, Patel remembered asking for water, but not whether he went on to decline it. A reasonable jury could conclude that Patel never declined an offer of water from Deputy Smith.

was still hyperventilating, and he was having noticeable difficulty speaking.  Many of the events at the Sheriff's Office were captured on a security camera.[3]

When Deputy Smith entered the holding room with the bond paperwork, Patel requested an ambulance.  After initially objecting—"[W]hat do you need an ambulance for?  You're being released."—Deputy Smith complied.  When paramedics arrived, they transported Patel to a local hospital, where he was diagnosed with heat exhaustion, heat syncope, and panic attack.

**B**

Patel sued Deputy Smith—along with other defendants, since voluntarily dismissed—claiming that Smith had violated the Fourteenth Amendment in two ways: (1) by using unconstitutionally excessive force when he placed Patel in an unventilated, un-air-conditioned transport van and kept him there for an unreasonable amount of time; and (2) by exhibiting deliberate indifference when he recklessly disregarded Patel's serious medical needs.[4]  Patel also brought state-

---

[3] Based on the security-camera footage, Patel's expert Dr. Reginald Nesbitt testified that he needed medical attention to reduce the risk that his condition would progress to heat stroke.

[4] Patel also claimed that Deputy Smith had violated his rights under the Fourth Amendment, but as a pretrial detainee, his rights—if any—under the Fourth Amendment are unclear.  "Although some courts have extended Fourth Amendment protections into the pretrial detention phase, '[n]either [this Court] nor the Supreme Court has decided whether the Fourth Amendment continues to provide individuals with protection from excessive force beyond the point at which an arrest ends and pretrial detention begins.'"  *Piazza v. Jefferson Cty.*, 923 F.3d 947, 952 n.6 (11th Cir. 2019) (alterations in original) (citation omitted) (quoting *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018)).  We needn't address Patel's Fourth Amendment claims, because for reasons we'll explain, they would effectively merge into Patel's Fourteenth Amendment claims, in any event.

law claims, including—as relevant to this appeal—allegations of negligence and intentional infliction of emotional distress.  Deputy Smith moved for summary judgment, challenging Patel's claims on the merits and claiming entitlement to qualified immunity with respect to Patel's federal constitutional claims and official immunity with respect to his state-law claims.  The district court granted the motion, concluding that Deputy Smith hadn't violated the Constitution and that official immunity barred Patel's negligence and intentional-infliction of emotional distress claims.

This is Patel's appeal.  We will begin by analyzing Patel's constitutional claims, and then move to his state-law claims.

## II

Patel's two Fourteenth Amendment claims—alleging excessive force and deliberate indifference to a serious medical need—are both subject to the doctrine of qualified immunity, which bars many damages actions against government officials.  "An officer asserting a qualified-immunity defense bears the initial burden of showing that he was 'acting within his discretionary authority.'" *Piazza v. Jefferson Cty.*, 923 F.3d 947, 951 (11th Cir. 2019) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)).  The district court here held that Deputy Smith was acting in the scope of his discretionary authority, and Patel hasn't challenged that determination on appeal.  Accordingly, Patel bears the

burden to show not only (1) that Deputy Smith "violated a constitutional right" but also (2) that "this right was clearly established at the time of the alleged violation." *Caldwell*, 748 F.3d at 1099 (internal quotation marks omitted) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).[5]  We will apply this framework to both of Patel's constitutional claims, beginning with excessive force.

## A

### 1

Prior to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), we had held that "[a] claim of excessive force under the Fourteenth Amendment [was] analyzed as if it were an excessive-force claim under the Eighth Amendment" and, therefore, that a "use of force against a pretrial detainee [was] excessive under the Fourteenth Amendment if it 'shock[ed] the conscience'" or was "applied maliciously and sadistically to cause harm." *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 n.5, 1217 (11th Cir. 2009) (quotation omitted).  In *Kingsley*, though, the Supreme Court clarified that the Eighth Amendment's malicious-and-sadistic standard—which applies to incarcerated prisoners—does not extend to pretrial detainees.  576 U.S. at 400–01.  Instead, the Court held that a pretrial detainee's Fourteenth

---

[5] "Only cases from the United States Supreme Court, this Court, and the highest state court under which the claim arose can clearly establish the law in our Circuit."  *Caldwell*, 748 F.3d at 1102 n.14.

Amendment excessive-force claim is governed by a rule of "objective reasonableness." *Id*. at 396–97 ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.").

By adopting an objective-reasonableness criterion, the *Kingsley* Court indicated a connection between the Fourteenth Amendment's excessive-force standard and the Fourth Amendment's standard, rather than the Eighth Amendment's. *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989), the seminal Fourth Amendment excessive-force case, for the proposition that "objective reasonableness turns on the 'facts and circumstances of each particular case'"). We expressly adopted this understanding of *Kingsley* in *Piazza v. Jefferson County*: "[I]nasmuch as it entails an inquiry into the objective reasonableness of the officers' actions," we summarized, "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." 923 F.3d at 952–53.

Notwithstanding *Kingsley*, the district court here pointedly distinguished Fourth Amendment precedent, citing our pre-*Kingsley* cases for the proposition that "[t]he standard for showing excessive force in violation of the Fourteenth Amendment . . . is higher than that required to show excessive force in violation of the Fourth Amendment." *Fennell*, 559 F.3d at 1217. But as we clarified in *Piazza*—which came down after the district court here issued its decision—that's

10

no longer true.  After *Kingsley*, the Fourteenth Amendment's standard is analogous to the Fourth Amendment's.  Had the district court applied the correct standard—*Kingsley*'s Fourth-Amendment-like objective-reasonableness test, informed by several contextual considerations—we think it would have concluded, as we do, that Deputy Smith violated Patel's Fourteenth Amendment right to be free from excessive force.[6]

We haven't directly confronted a "hot car" case before now, but variations of this fact pattern are understandably common.  To try to bring clarity to the law governing such circumstances, we'll identify the considerations that inform our decision, but we can't hope to lay down a neat rule; as the Supreme Court has explained—for better or worse—"objective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396).  By way of elaboration, the *Kingsley* Court offered the

---

[6] The district court seemed to think that Patel's claim couldn't be properly analyzed as an excessive-force claim because it looked more like a conditions-of-confinement claim.  Perhaps it could be either.  But Patel pleaded an excessive-force claim, and we think that placing and holding a detainee in a hot, unventilated, un-air-conditioned van for transport between jails can be understood as an application of force—and can thus be analyzed under *Kingsley*—even if it might also have been pleaded (and analyzed) as a conditions-of-confinement claim.  In any event, the district court also refused to evaluate Patel's claim as a challenge to his conditions of confinement on the ground that a court "may not infer claims other than those that plainly appear on the face of the complaint . . . ."  *Patel v. Lanier Cty.*, No. 7:17-CV-85 (HL), 2019 WL 1429231, at *6 (M.D. Ga. Mar. 29, 2019) (quoting *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998)).

11

following list of relevant considerations, which it said were not meant "to be exclusive":

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

*Id.* We will consider the *Kingsley* factors in turn and explain how they apply here.

First and foremost, *Kingsley* directs us to weigh "the relationship between the need for the use of force and the amount of force used." *Id.* Let's initially consider the "amount" side of the ledger. Whenever the force used against a pretrial detainee consists in his subjection to hazardous conditions, the "amount of force used" is a function of two component factors—(1) the severity of those conditions and (2) the duration of his subjection to them. These two considerations combine to create a sliding scale: The more severe the conditions, the shorter the detention need be before it amounts to excessive force—and vice versa. Now, how about "need"? In cases involving pretrial detainees, there is always (by definition) some need to detain, at least until a judge authorizes a release. But, it seems to us, the need for detention *in relatively harsh conditions* depends both on the threat that the detainee poses and on the feasibility of alternative means of holding him. Again, a sliding scale: Detention in harsher conditions may be justified where

12

alternative modes of detention are not readily available, especially if the detainee poses a heightened risk of danger to police or the public; by contrast, where the detainee poses no particular risk or where an alternative is at hand, the "need" for harsher modes of detention dissipates.

Here, Patel was kept in a hot transport van—without any ventilation or air conditioning—for a period of approximately two hours. While those facts alone don't entitle Patel to a trial on his excessive-force claim, we note that detentions of comparable duration and severity have been held to create jury questions.[7]

---

[7] Courts considering excessive-force claims arising from detention in extreme temperatures have treated duration as an important factor. *See, e.g.*, *Hayenga v. Garth*, No. 18-cv-02038-KLM, 2019 WL 2471086, at *8 (D. Colo. June 13, 2019) ("Here, Plaintiff has entirely omitted how long he believes he was detained in the hot police car, which is an essential element to be taken into consideration in connection with his excessive force claim. Without alleging such information, Plaintiff cannot demonstrate that the force used was objectively unreasonable."). Detentions in potentially dangerous ambient temperatures for less than 30 minutes have generally been treated as reasonable as a matter of law, while detentions lasting multiple hours usually present fact questions. *Compare Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (holding that detaining the plaintiff in a police car in 90 degree heat for three hours created a triable issue of excessive force), *with Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (granting summary judgment to the defendants and holding that leaving the plaintiff in a squad car for 10 minutes was not excessive force). *See also Smith v. Doe*, No. 6:17-cv-799-Orl-37TBS, 2017 WL 2464126, at *3–*4 (M.D. Fla. June 7, 2017) (collecting cases). The few intermediate examples—all involving detentions of about an hour—have also been held to create jury questions. *See, e.g.*, *Wilcomb v. City of Houston*, No. H–17–1866, 2018 WL 925081, at *1, *4–*5 (S.D. Tex. Feb. 16, 2018) (holding that leaving an arrestee "outside in unobstructed sunlight for an hour and twenty minutes while the temperature averaged 100.4 degrees Fahrenheit with a heat index of 106.3 degrees Fahrenheit" was a sufficient allegation of excessive force). Of course, there are no hard-and-fast rules; courts must take duration into account on a case-by-case basis. *See Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) ("Whether an officer's actions are objectively reasonable is a function of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (quotation marks omitted)). Although many of these "hot car" cases arose under the Fourth Amendment, the same basic standard applies post-*Kingsley* (as we have explained) to excessive-force claims brought under the Fourteenth Amendment.

13

Moreover, for nearly half of Patel's detention—the 55 minutes during which he was left unattended in the sally port—Deputy Smith presumably could have moved him inside the Lowndes County jail while he made arrangements to transport Grant. Hence, it seems to us that a significant fraction of the force applied to Patel was not just harsh but also unnecessary.

Second, the "extent of the plaintiff's injury." We don't think the *Kingsley* Court meant to suggest that unforeseeable injuries can transform a reasonable application of force into an excessive one. *Cf. Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (instructing lower courts "to decide [Eighth Amendment] excessive force claims based on the nature of the force rather than the extent of the injury"). But resulting injuries can be an indicator, however imperfect, of the severity of the force that caused them. *Cf. McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019) ("The extent of injury is relevant to the Eighth Amendment inquiry because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in a particular situation . . . ."). Patel was diagnosed with heat exhaustion and related ailments as a result of being locked in the hot transport van. These injuries, while not permanent, are suggestive of the harshness of the force applied against him.

Third, the "effort made by the officer to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397. What steps could Deputy Smith have taken to

14

ameliorate Patel's situation?  Most obviously, he could have turned on the van's ventilation fans or, perhaps, cracked any windows that might have allowed air into the prisoner compartment—but he didn't.  Other courts considering similar circumstances have noted the presence or absence of ventilation or air conditioning as an important factor.  *See, e.g.*, *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (faulting officers because they "could have left the windows slightly open, for example, or utilized the car's cooling or ventilation devices" but failed to do so).  As already noted, Deputy Smith could also have taken Patel inside the Lowndes County jail—but again, he didn't.  So far as we can tell, Deputy Smith didn't make "any effort . . . to temper or to limit" Patel's situation.  Worse, for much of the time, he left Patel alone—rendering any mitigation impossible, no matter how obvious the need for relief might have become.

Finally—we'll take *Kingsley*'s fourth, fifth, and sixth factors together—there is no evidence to indicate that Deputy Smith faced any "security problem," that he "reasonably perceived" any "threat," or that Patel "was actively resisting."  *Id.*  By all accounts, Patel never resisted Deputy Smith at all—and, indeed, as a result of Smith's neglect, Patel was, for much of the time, physically incapable of mounting any resistance.

Although *Kingsley*'s list isn't "exclusive," its factors suffice to resolve the constitutional question here.  Construing the facts and accompanying inferences in

15

his favor, the *Kingsley* factors tilt decisively toward Patel.  Accordingly, we conclude that in the particular circumstances of this case, Patel's detention and transport were "more severe than [was] necessary to . . . achieve a permissible governmental objective."  *Piazza*, 923 F.3d at 952.  Because the force Deputy Smith applied was not "objectively reasonable," it violated Patel's Fourteenth Amendment rights.

**2**

That's the good news for Patel on excessive force.  Now the bad:  Although we conclude that Deputy Smith violated Patel's constitutional rights, we cannot say that the underlying law applicable to Patel's excessive-force claim was sufficiently "clearly established" to defeat qualified immunity.  Before explaining why, we must first address Patel's threshold contention that, in the context of a Fourteenth Amendment excessive-force claim, he doesn't have to show a clearly established right.

**a**

The usual rule in a qualified-immunity case is that, in addition to proving a constitutional violation, the plaintiff must demonstrate that the law underlying his claim was "clearly established" at the time of the incident in question.  *See Kingsley*, 576 U.S. at 400 (quotation omitted).  It is true, as Patel says, that in *Johnson v. Breeden*, 280 F.3d 1308, 1321–22 (11th Cir. 2002), and *Fennell*, 559

16

F.3d at 1216–17, we articulated a sui generis exception to that general rule for Eighth and Fourteenth Amendment excessive-force claims. But that exception was justified only by an idiosyncrasy of those claims—an idiosyncrasy that, with respect to those arising under the Fourteenth Amendment, *Kingsley* eliminated. As a result, Patel can no longer rely on our previous holdings but, rather, must prove that his right not to be subjected to prolonged detention in the hot transport van was clearly established. Let us explain.

In *Fennell*, we held that "[f]or claims of excessive force in violation of the Eighth or Fourteenth Amendments, . . . a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth or Fourteenth Amendment rights have been violated." 559 F.3d at 1216–17 (citing *Johnson*, 280 F.3d at 1321–22). That exception made sense, we said, "because, for an excessive-force violation of the Eighth or Fourteenth Amendments, 'the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution . . . .'" *Fennell*, 559 F.3d at 1217 (alteration in original) (quoting *Johnson*, 280 F.3d at 1321–22).

Normally, of course, such a square holding would bind us. "We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or

17

Supreme Court decision."  *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998).  Here, however, it's clear to us that the *Johnson*/*Fennel* exception can't survive *Kingsley*, which "is clearly on point and has undermined [those decisions] to the point of abrogation."  *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).  The *Johnson*/*Fennel* exception rested entirely on the "extreme" subjective-intent element of Eighth and (then) Fourteenth Amendment excessive-force claims.  *Kingsley*, though, expressly eliminated *any* subjective element for such claims arising under the Fourteenth Amendment—at least as to the excessiveness of the force.  576 U.S. at 395 (holding "that the relevant standard is objective not subjective" and, accordingly, that "the defendant's state of mind is not a matter that a plaintiff is required to prove").[8]  In so doing, the Supreme Court likewise eliminated the justification for the *Johnson/Fennel* exception itself—

---

[8] Of course, the *application* of force must itself be intentional, or at least reckless.  *Kingsley*, 576 U.S. at 396 ("[I]f an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim.").  But a subjective inquiry as to the application of force doesn't help to justify the *Johnson/Fennel* rule, which is based on a subjective standard "so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution."  *Fennell*, 559 F.3d at 1217 (internal quotation marks and citation omitted).  Plainly, not every intentional use of force can be so described.  Indeed, intentionality (or possibly recklessness) as to the application of force is an element of an excessive-force claim even in the Fourth Amendment context.  *See Kingsley*, 576 U.S. at 401 (indicating that in the Fourth Amendment context the Court has required a showing of "intent to commit the *acts* in question" rather than a showing of "subjective intent" as "to whether the force intentionally used was 'excessive'" (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 854 & n.13 (1998))); *id.* at 396 (hinting that as to intent to commit the acts in question "recklessness in some cases might suffice as a standard for imposing liability" for Fourth Amendment violations (citing *Lewis*, 523 U.S. at 849)).

effectively undermining that special rule "to the point of abrogation," at least as to Fourteenth Amendment excessive-force claims. *See Archer*, 531 F.3d at 1352. And if that weren't enough, the *Kingsley* Court expressly acknowledged that the clearly-established prong of the qualified-immunity inquiry would govern such claims. *See* 576 U.S. at 400 ("Additionally, an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right . . . ." (quotation omitted)). As a result, although the *Johnson*/*Fennel* exception continues to apply to Eighth Amendment claims, we must abandon it as applied in the Fourteenth Amendment context.

**b**

Applying the ordinary qualified-immunity framework, we conclude that Patel's constitutional rights here were not clearly established at the time of his transport between Cook, Lowndes, and Lanier Counties. A right is clearly established when "the state of the law g[ives] the [defendants] fair warning that their alleged conduct [is] unconstitutional." *Caldwell*, 748 F.3d at 1102 (second alteration in original) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003)). "There are various ways to evaluate whether a right is clearly established":

> First, the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court. . . . The prior case law need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Second, the plaintiff can identify a broader, clearly established principle that

19

should govern the novel facts of the situation. Third, the plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary.

*J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018) (internal quotation marks and citations omitted). At the time of the constitutional violation here, there existed no clearly established law that could have given Deputy Smith fair notice that confining Patel as he did amounted to excessive force.

For starters, Patel can point to no "materially similar case." *Id*. The closest, it seems to us, is *Danley v. Allen*, which held that "subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—[t]here . . . pepper spray lingering in the air and on him—can constitute excessive force." 540 F.3d 1298, 1308 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).[9] But the force used against Danley was altogether different from the force used against Patel. Danley was left to stew in pepper-spray vapor in a poorly ventilated cell, and although he was released from the fumes and allowed a quick shower after 20 minutes—less time than the two hours that Patel was left in the

---

[9] "This circumstance is to be distinguished from environmental conditions that generally affect the inmates in the jail, which are analyzed as conditions of confinement claims." *Danley*, 540 F.3d at 1309.

van—his shower, we emphasized, "did not permit him adequate time for effective decontamination."  540 F.3d at 1304, 10.  Because the jailers took only this "inadequate measure to ameliorate the effects" of their use of force, we explained, Danley ultimately spent "a total of twelve to thirteen hours of suffering" in jail without ever being able to fully cleanse himself of the pepper-spray residue.  *Id.* at 1305, 10.  In any event, our holding that the pepper-spray incident in *Danley* was unconstitutional didn't give Deputy Smith fair notice that his treatment of Patel was excessive.  Although our precedent clearly establishes that environmental conditions can amount to excessive force in violation of the Fourteenth Amendment, our previous cases would not have put Deputy Smith on notice that the particular conditions he caused were sufficiently harsh.

We note that *Danley* cites *Burchett*—a Sixth Circuit case with facts quite similar to this one—for the proposition "that confining . . . an arrestee, in a 'police car with the windows rolled up in ninety degree heat for three hours constituted excessive force' in violation of the Fourth Amendment."  540 F.3d at 1309 (quoting *Burchett*, 310 F.3d at 945).  But a mere citation to an out-of-circuit decision—even with approval, and even with an accompanying factual précis—cannot clearly establish the law for qualified-immunity purposes.  *See Caldwell*, 748 F.3d at 1102 n.14 ("Only cases from the United States Supreme Court, this Court, and the highest state court under which the claim arose can clearly establish

21

the law in our Circuit."); *cf. also Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th

Cir. 1999) ("[D]icta cannot clearly establish the law for qualified immunity

purposes." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir.1996))).

Moreover, and in any event, even if *Burchett*—or *Danley*'s citation of it—

could clearly establish the law in general, it wouldn't clearly establish that Deputy

Smith's particular conduct violated Patel's constitutional rights.  The detention in

*Burchett* was both (1) somewhat longer—three hours with no ventilation, as

compared to two hours here, less than half of which was wholly unventilated—and

(2) somewhat more severe—a 90 degree ambient temperature, as compared to 85

degrees.  310 F.3d at 940.  Close, but not close enough—because all agree that

confining a pretrial detainee in a hot vehicle for just a short time wouldn't be

unreasonable, law-enforcement officials need some leeway in this area.

Accordingly, we will not impute notice in a hot-car case unless the analogy to

preexisting case law is clear.

Nor, we think, does any "broad[] . . . legal principle" laid down in any

controlling case clearly establish that Deputy Smith's application of force was

excessive.  *J W*, 904 F.3d at 1259.  Although *Kingsley* established that all

objectively unreasonable applications of force against pretrial detainees violate the

Fourteenth Amendment, 576 U.S. at 396–97, confining a prisoner in a hot transport

van, even for a couple of hours, is not so obviously unreasonable that Deputy

22

Smith should have known better in the absence of case law more closely on point. Patel doesn't point to any other case that established "a broad[], clearly established principle that should govern the novel facts of the situation," *J W*, 904 F.3d at 1259, and we aren't aware of any.

Nor, finally, was Deputy Smith's conduct so egregious "that prior case law is unnecessary" to establish a clear violation of the Fourteenth Amendment. *Id.* at 1260. Although Patel's detention and transport were no doubt exceedingly uncomfortable—and as it turns out, dangerous—Deputy Smith's conduct was not akin to those instances "so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point." *Lee v. Ferraro*, 284 F.3d 1188, 1190–91, 1199 (11th Cir. 2002) (alteration in original) (quotation omitted) (identifying a violation of a clearly established constitutional right despite a dearth of relevant case law where an officer stopped the plaintiff for honking her horn, excoriated her in profane and racially incendiary terms, pulled her from her car, frisked her, and slammed her head against the trunk, all without any resistance on her part).

Having exhausted all alternatives and found nothing in the then-existing law that would have given Deputy Smith fair notice that his particular conduct amounted to excessive force in violation of the Fourteenth Amendment, we are constrained to conclude that he is protected by qualified immunity as to Patel's

first claim.  We therefore affirm the district court's grant of summary judgment on this point, albeit on different grounds.

## B

We turn, then, to Patel's allegation that Deputy Smith exhibited deliberate indifference, in violation of the Fourteenth Amendment, by failing to provide medical care in response to his serious medical need.  This claim, of course, is subject to the same two-step qualified-immunity analysis that governed Patel's excessive-force claim.  We will consider the two prongs in turn.

## 1

The basic standards governing Patel's Fourteenth Amendment deliberate-indifference claim are uncontested and, here, are "identical to those under the Eighth."  *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  Patel bears the burden of proving (1) that he had an objectively "serious medical need," (2) that Deputy Smith acted with subjective "deliberate indifference to [that] serious medical need," and (3) that he suffered an "injury . . . caused by [Deputy Smith's] wrongful conduct."  *Id.*  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,'" *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm," *Mann*

24

*v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).  A defendant is deliberately indifferent to a plaintiff's serious medical need when he "(1) ha[s] subjective knowledge of a risk of serious harm; (2) disregard[s] that risk; and (3) act[s] with more than gross negligence."  *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010).[10]

Patel argues that he suffered from a serious medical need during his transport between Cook, Lowndes, and Lanier Counties and that Deputy Smith was deliberately indifferent to it.  In rejecting this claim, the district court said that Patel "fail[ed] to cite to any case law or evidence to support his contention that his unresponsiveness . . . was an objectively serious medical need."

We disagree.  Taking the facts in the light most favorable to Patel, there was ample evidence.  Grant testified that when she was brought to the van, Patel was "lying unconscious on the floor of the van" and "breathing very fast," that no fan

---

[10] We pause briefly to flag a tension within our precedent regarding the minimum standard for culpability under the deliberate-indifference standard.  Although we have repeatedly noted that "a claim of deliberate indifference requires proof of more than *gross* negligence," *e.g.*, *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (emphasis added), another line of our cases favors the phrase "more than *mere* negligence," *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (emphasis added).  A panel of this Court recently suggested that "the 'more than mere negligence' standard in *McElligott* is more consistent with *Farmer* [*v. Brennan*, 511 U.S. 825 (1994),] than the 'more than gross negligence' standard in *Townsend*."  *Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016).  These competing articulations—"gross" vs. "mere" negligence—may well represent a distinction without a difference because, as explained below, the Supreme Court itself has likened the deliberate-indifference standard to "subjective *recklessness* as used in the criminal law."  *Farmer*, 511 U.S. at 839–40 (emphasis added).  Accordingly, no matter how serious the negligence, conduct that can't fairly be characterized as *reckless* won't meet the Supreme Court's standard.

or air conditioning was running, and that the back of the van was "very hot."  She further testified that she was surprised that no one offered medical care to Patel because "it was clear to [her] that [he] was in distress."  She added that even after Deputy Smith roused Patel, placed him back on a bench, and began driving, Patel didn't open his eyes, continued to hyperventilate, and "appeared to be unconscious."  Finally, she explained that on the way to Lanier County, Patel again fell to the floor of the van, that he was still unconscious, that he was hyperventilating, and that he had mucus running from his nose and mouth.

To Grant's account, Patel added expert testimony regarding his condition after Deputy Smith finally delivered him to Lanier County.  In particular, Dr. Reginald Nesbitt testified not only about his ultimate diagnosis—heat exhaustion, heat syncope, and panic attack—but also about the seriousness of the symptoms he saw in security-camera footage.  Even Deputy Smith admitted to noticing some of the symptoms that indicated a need for medical care—that Patel was shaking and that mucus was running out of his nose.

A jury could infer from these facts all the necessary elements of a deliberate-indifference-to-medical-needs claim.  First, a jury could conclude that Patel's condition was objectively serious.  Because Patel was not diagnosed as needing medical care until after the conduct he complains of, his claim requires evidence that "even a lay person would easily recognize the necessity for a doctor's

26

attention." *Taylor*, 920 F.3d at 733 (internal quotation marks and citation omitted). Check; even to a layperson, unconsciousness alone should serve as a strong indicator of the need for immediate medical attention, at least where—as here—context doesn't indicate a benign explanation. On the record before us, we cannot simply assume that Patel was sleeping peacefully; viewed in the light most favorable to Patel, the facts permit the reasonable inference that his unconsciousness was a sign of distress. Moreover, Patel wasn't just unconscious, he was sweating and hyperventilating—more than enough to indicate to a layperson that he needed help. Finally, there was evidence of shaking, profuse drooling, and a severely runny nose, as well as difficulty speaking. Not surprisingly in light of all this evidence, Grant—a layperson and eyewitness to Patel's condition—testified that Patel's physical distress was "clear."

As for the second, subjective prong, we think the evidence that Deputy Smith witnessed most of Patel's symptoms firsthand and yet provided *no* medical attention suffices to demonstrate that Smith was deliberately indifferent. A jury doesn't need direct evidence of Deputy Smith's state of mind but, rather, may infer the necessary subjective facts from circumstantial evidence—including inferences "from the very fact that the risk was obvious." *Goebert*, 510 F.3d at 1327 (internal quotation marks omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Here, the circumstantial evidence would allow a jury to infer "subjective

27

knowledge of a risk of serious harm" because (1) Deputy Smith witnessed symptoms that even a layperson could recognize as indicating that risk and (2) Smith wasn't any ordinary layperson—he was trained as a medical first responder. *Id.* (internal quotation marks omitted) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). A jury could also find "disregard" of the risk based on the fact that Deputy Smith provided no intervention until after he delivered Patel to the Lanier County Sheriff's Office, and then only reluctantly. *Id.* (internal quotation marks omitted) (quoting *Bozeman*, 422 F.3d at 1272). Finally, the conduct here was worse "than gross negligence" because Deputy Smith utterly refused to respond to the severe symptoms that he saw. *Harper*, 592 F.3d at 1234. Deputy Smith's *total* inaction is telling; he not only failed to enlist the help of a medical professional in the face of a serious medical need, but he failed even to provide water on request and made no attempt to treat Patel himself despite having first-responder training. And of course it was Deputy Smith's neglect—leaving Patel in a hot, unventilated, un-air-conditioned transport van—that created the danger in the first place.

Finally, the evidence amply supports the conclusion that Deputy Smith's deliberate indifference caused Patel harm. Patel's hospitalization and diagnoses alone suffice to establish a jury question as to injury. And the very identity of his

28

diagnosed conditions—heat exhaustion and heat syncope—indicate heat exposure as their most likely cause.

\* \* \*

For all these reasons, we conclude that Patel has presented sufficient evidence to prove every element of a Fourteenth Amendment deliberate-indifference claim.

**2**

We turn once more, then, to the second step of qualified immunity—that is, whether the right that Patel alleges was clearly established. Although we haven't identified any controlling case with closely analogous facts, we think "the novel facts of the situation" are obviously governed by a "broader, clearly established principle." *J W*, 904 F.3d at 1259. "The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Both aspects of this articulation— knowledge and intentional refusal—are on full display here.

This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution. No more notice was necessary because "the assumed circumstances here are stark and simple, and the

[preexisting] decisional language . . . obviously and clearly applies." *Bozeman*, 422 F.3d at 1274. This is not a case in which a law-enforcement officer provided inadequate aid, the reasonableness of which can be fairly disputed. Here, at least on the facts as we must take them, Deputy Smith provided no timely aid—he was confronted with a serious medical need and did *nothing*. Because we have made clear that such complete abdication in the face of a known serious need is unconstitutional, Deputy Smith is not entitled to qualified immunity.[11]

*    *    *

---

[11] We have previously suggested in dicta that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992)). Subsequently, however, we have reserved the question whether prior decisional law must clearly establish that the specific medical issue complained of—here, heat exhaustion—counts as a serious medical need. *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1426 n.7 (11th Cir. 1997), *overruled in part on other grounds by LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009). We have also opined, in dicta, that our "general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury" because "[t]he cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when." *Bozeman*, 422 F.3d at 1274. We think it unlikely that an officer will be able to avail himself of qualified immunity where, as here, the evidence allows the inference that he was aware of *and flatly ignored* a serious risk of harm requiring medical attention just because our prior case law didn't put him on notice of that risk. Because a serious medical need is, by definition, one that has been diagnosed as needing treatment or one that would be obvious to lay people, no officer can be unfairly surprised to learn that he violated the Constitution by flatly ignoring it. We leave open the question whether an officer who takes inadequate measures to treat a dangerous condition may be entitled to qualified immunity where previous case law didn't put him on notice that his response was deficient.

30

So ends our analysis of Patel's federal constitutional claims.  Construing the facts and associated inferences in the light most favorable to Patel, we have identified two violations of the Fourteenth Amendment—one because Deputy Smith employed excessive force in detaining Patel in a hot, unventilated, and un-air-conditioned transport van for approximately two hours, and another because Deputy Smith was deliberately indifferent to Patel's resulting medical needs.  We conclude that qualified immunity shields Deputy Smith from liability on Patel's excessive-force claim, but not on his deliberate-indifference claim.

## III

We turn, finally, to Patel's state-law claims—for negligence and intentional infliction of emotional distress—and to Deputy Smith's corresponding official-immunity defense.  The district court granted summary judgment to Deputy Smith on official-immunity grounds.  "Under Georgia law, a public officer or employee may be personally liable only for [1] ministerial acts negligently performed or [2] acts performed with malice or an intent to injure." *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010) (internal quotation marks omitted) (quoting *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001)).  Indeed, the immunity goes farther than that; unless the public employee acts maliciously or pursuant to a ministerial duty, he is immune not just from liability but also from suit based on the performance or nonperformance of his official functions.  *Barnett v. Caldwell*, 809 S.E.2d 813, 847

31

(2018).  Notably, the question whether official immunity attaches cannot always be decided on summary judgment:  "While the question of whether a government employee is entitled to official immunity is one of law that the trial court ultimately must determine, where the relevant facts pertaining to immunity are in dispute, the trial court is without authority to resolve those factual issue on a motion for summary judgment."  *Glass v. Gates*, 716 S.E.2d 611, 621 (Ga. Ct. App. 2011).

Although Patel did not move for summary judgment on his state-law claims, he opposed Deputy Smith's immunity-based motion and continues to contest it on appeal.  In particular, Patel contends that official immunity does not apply because Deputy Smith violated a "ministerial" duty by leaving him unattended in the transport van.  "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty."  *Grammens*, 697 S.E.2d at 777 (internal quotation marks omitted) (quoting *McDowell v. Smith*, 678 S.E.2d 922, 924 (Ga. 2009)).  Its opposite is a discretionary act, which "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."  *Id.* (internal quotation marks omitted) (quoting *McDowell*, 678 S.E.2d at 924).  "A ministerial duty may be established in a variety of ways, including by written or

32

unwritten policy, a supervisor's directive, or by statute." *Hill v. Jackson*, 783 S.E.2d 719, 725 (Ga. Ct. App. 2016).

In support of his argument that Deputy Smith is not entitled to official immunity, Patel points to a written policy of the Lanier County Sheriff's Office on the subject of "Transporting Arrested Persons," which he says creates a ministerial duty not to leave detainees alone in vehicles during transport.  The text of the policy does appear to lay down a "simple, absolute, and definite" duty to that effect.  *Grammens*, 697 S.E.2d at 777 (internal quotation marks and citation omitted).  Under the subheading "Transport Guidelines," Policy Statement 7 reads: "Detainees may not be left unattended during transport."  Deputy Smith doesn't deny the existence of such a policy—nor, apparently, does he dispute that the policy sets out a ministerial duty.  Instead, he insists that the policy doesn't apply to the transport of pretrial detainees like Patel, but "solely to recently arrested individuals being transported in custody for the first time."  Br. of Appellee at 31.

To be sure, certain elements of the policy might be read to suggest that it is limited to recent arrestees.  For one thing, the subject heading of the policy reads: "Transporting Arrested Persons."  For another, the policy requires every detainee to be "*thoroughly* searched for any weapons or contraband . . . prior to transport," and for transporting officers to provide the dispatcher with the "[i]dentity of the detainee . . . so a warrant check can be completed" and the "[a]rrest location"—

33

procedures that perhaps apply more naturally in the context of an initial arrest than the context of transporting a pretrial detainee to or from a hearing.  The policy also uses terms like "arrestee," "person in custody," and "[a]rrested [p]erson[]" alongside the more general "detainee," arguably indicating that the terms are interchangeable, and thus that the scope of the word "detainee" should be circumscribed.

On balance, though, we think the policy's text indicates that it applies to the transport of *all* detainees.  Although the policy occasionally uses other terms as well, it overwhelmingly favors the general term "detainee."  Additionally, while the policy's search protocol might apply most obviously in the context of a fresh arrest, the same provision unambiguously refers to "[a]*ll* detainees"—a broad term that resists a narrow interpretation.  And it is entirely sensible to insist on a thorough search before any "detainee" is transported; a pretrial detainee, for instance, could well have some item of jail-made contraband on his person.  Perhaps most significantly, Policy Statement 6 under the "Transport Guidelines" subheading—the provision immediately preceding the one that creates the ministerial duty here—seems to confirm that the policy applies to more than just those recently arrested.  It reads: "Transport of detainee[s] for any reason after incarceration, is accomplished by sworn officers or specially trained transportation officers."  The phrase "[t]ransport of detainee[s] . . . after incarceration" cannot be

34

squared with an interpretation of the word "detainee" that is limited to recent arrestees.

Accordingly, we think the textual evidence tilts in favor of Patel's position. In addition to his textual arguments, though, Deputy Smith introduced oral testimony to support his contention that the policy doesn't apply to pretrial detainees. Lanier County Lieutenant Sheriff Robert Cuellar testified that no written policies govern the transportation of pretrial detainees. Lieutenant Jerry Cherry likewise testified that leaving a detainee unattended in a transport van doesn't violate any written policy. Cherry also stated that when transporting multiple inmates to different jails, department practice is to leave those not being dropped off in the van with the fan running, although he admitted that he had never personally confronted that situation.

Given the strength of Patel's textual arguments, the supervising officers' testimony cannot demonstrate the absence of a ministerial duty *as a matter of law*, so as to justify summary judgment in Deputy Smith's favor. Nevertheless, their testimony does suggest that, in practice, the policy might have been implemented by Deputy Smith's superiors in a way that departed from the policy's language. Patel does not deny that testimonial evidence contradicting a written policy can be

considered when deciding whether a ministerial duty existed[12]—he merely argues that the evidence here creates a factual question that a jury should decide. We agree.

On remand, then, a jury should determine—in light of the written policy and the testimonial evidence—whether Deputy Smith's conduct was governed by a "specific, simple, absolute, and definite duty" not to leave detainees like Patel unattended during transport. *See Barnett*, 809 S.E.2d at 816 ("[A] written (or unwritten) policy, a supervisor's specific directive, or a statute may establish a ministerial duty—but only if the directives are so clear, definite, and certain as to merely require the execution of a specific, simple, absolute, and definite duty, task or action in a specified situation without any exercise of discretion."). The jury's answer to this question will inform the district court's legal conclusion as to whether official immunity applies. We therefore reverse the district court's grant of summary judgment to Deputy Smith on official immunity grounds.

---

[12] Both parties accept the proposition that testimonial evidence extrinsic to a written policy may be introduced for the purpose of contradicting its terms when determining whether a ministerial duty existed, and both cite *Davis v. Phenix City* for that proposition. 513 F. Supp. 2d 1241, 1250 n.2 (M.D. Ala. 2007) (reasoning that "while interpretation of written policies is generally a question of law," conflicting testimony can "create[] a question [of fact] as to what the true practice is"). We haven't found any direct support for this proposition in Georgia law, but because Patel doesn't dispute it, we assume—without deciding—that it is correct. And because Patel didn't move for summary judgment, we needn't decide whether or not the particular testimony here was enough to create a genuine issue of fact. Even assuming it was, it still wouldn't be enough to resolve the question in Deputy Smith's favor *as a matter of law*.

## IV

In summary, we hold that the district court prematurely terminated claims that should have been considered at trial. The record contains sufficient evidence to support Patel's claim that Deputy Smith violated the Fourteenth Amendment both by employing excessive force and by failing—with deliberate indifference—to address Patel's serious medical need. And although the law supporting Patel's excessive-force claim was not sufficiently clearly established to overcome Deputy Smith's qualified-immunity defense, Patel's deliberate-indifference claim should not have been disposed of summarily. Additionally, because the record would permit a jury to find that Deputy Smith was subject to a ministerial duty not to leave Patel unattended, Patel's state-law claims should have survived the motion for summary judgment, as well.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.